(64 App. Div. 130.)

PEOPLE v. MONROE.

(Supreme Court, Appellate Division, Fourth Department. July 23, 1901.)

1. LARCENY—FALSE PRETENSES—EVIDENCE.

Witness testified, in a prosecution for false pretenses, that after she had been interviewed by the coroner as to her knowledge concerning an alleged murder, and was dismissed as not implicated, defendant, an attorney at law, falsely represented to her "that it was already started" in the police court for her arrest, and there was strong evidence against her; that many innocent people were imprisoned; that his employment was necessary; and secured $25 from her as a fee for defending her. Defendant and his principal witness testified that the prosecuting witness voluntarily sought defendant and engaged him. *Held*, that the evidence was sufficient to sustain conviction.

2. SAME—INFORMATION.

An information charging defendant with "obtaining, by threats and by false and fraudulent representations, the sum of $25 from C.," was sufficient, under Pen. Code, § 528, defining larceny as taking from the possession personal property "by color or aid of fraudulent or false representation or pretense."

Appeal from Monroe county court.

C. Wilbur Monroe was convicted of larceny, and appeals. Affirmed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and RUMSEY, JJ.

George D. Forsyth, for appellant.
Robert Averill, Asst. Dist. Atty., for the People.

SPRING, J. Based on information upon oath of one Minnie Cansdale, the defendant was arrested upon a warrant issued by the police justice of the city of Rochester, charging him with the crime of petit larceny, in "obtaining by threats, and by false and fraudulent representations, the sum of twenty-five dollars from Minnie Cansdale, September 13, 1900, at Rochester, N. Y." The defendant was arraigned, and pleaded not guilty, and, after a trial, was convicted by the police magistrate, and sentenced to the Monroe county penitentiary for two years, which conviction was affirmed by the county court.

The only questions presented for our consideration are whether the facts contained in the information and proved upon the trial constitute the crime charged, and whether the conviction is justified by the evidence. A brief review of the prominent facts is necessary: The body of one Covell was found in a sand pit in the city of Rochester on the 12th day of September, 1900, and near it were a woman's hat, an umbrella, and a handkerchief. On the preceding day Covell, who was a cartman, had been engaged in moving the furniture of Mrs. Cansdale to a store which she was carrying on. The coroner at once began an investigation to ascertain the cause of Covell's death, and Mrs. Cansdale was subpœnaed to appear, but was not examined on the public proceeding. She was interviewed privately by the coroner, and that official was satisfied she was not implicated in Covell's death, and permitted her to return home. On the following day she had a conversation relative to the death of Covell with Mr. West, who occupied the floor above her store, and of whom she had purchased the goods or lease of the store. The defendant is an attorney and counselor at law, and West, who is an Italian, had been in the habit of procuring clients for him. West brought the defendant to Mrs. Cansdale, and a conversation then occurred in which the alleged representations were made which are the foundation of the charge against the defendant. The complainant was the principal witness for the people. She testified that the defendant said he wanted to defend her. That when she insisted she was not guilty he replied: "There is strong evidence against you, and more enemies than you know of, because we know all these things. * * * Many is the innocent one that is locked up, and many is the innocent one that is brought before the grand jury, and we can't tell how this is going to turn out." A further statement, if she would give him $25, "that he would settle arrangements, and find out these things, and I wouldn't have to be locked up. * * * He would try to make it all right; yes, that I wouldn't have to go to the police court or anything. * * * That I was liable to go, because the way things was it was so well started that there was not much of any other help for me." In response to a question asked by the defendant, she testified: "He said he knew a great part of it, and probably more than I did, because he was at the court, and he heard those things." Again, that he said to her: "There was such strong evidence against me that I couldn't help being arrested." That he told her: "It was already started in the police court for her arrest," "because there had been such strong evidence against me." Under

the pressure of these representations, and to relieve herself from the stigma of an arrest and confinement in jail, which she believed was inevitable unless averted by the defendant, she paid him the $25. If her story is to be credited, the defendant stimulated her fears by the statement that proceedings were already under way for her arrest; he was a praticing lawyer, and assumed to possess inside information as to the result of the legal proceedings; and that he could ward them off if he was paid the $25, but without his intervention she was in imminent peril of punishment, as "there was strong evidence against her." If the defendant up to that time had in fact made any inquiries at all, he knew no complaint had been lodged against her, and that the coroner had exonerated her from any suspicion which may have arisen connecting her with the death of Covell. The defendant and West contradict Mrs. Cansdale. West testified he talked the matter over with her, and suggested that she employ an attorney, and she requested him to engage one for her, and he accordingly asked the defendant to call upon her. Both of these men testified that the defendant said nothing to frighten her; that she narrated to him the facts connected with her appearance before the coroner, and that the $25 were voluntarily paid as a retainer; that defendant was to investigate the matter pending before the coroner, and that the acceptance of the money simply created the relation of attorney and client between them. The 13 year old daughter of West testified that on the day before defendant called at the store of Mrs. Cansdale the latter asked if her father knew of any good lawyer, and the little girl replied, "When he comes home I will tell him," which she did. This contradictory testimony made a question of fact, which the police justice has solved in favor of the people. He had the witnesses before him, doubtless knew the defendant, and probably his chief witness, and believed the version of the transaction given by Mrs. Cansdale, and we are not disposed to overturn his conclusion on the facts.

The charge is within the enlarged definition of "larceny" given in section 528 of the Penal Code; that is, that the defendant, "with the intent to deprive or defraud" Mrs. Cansdale of her property, obtained from her possession, "by color or aid of fraudulent or false representation or pretense," the sum of $25. This constituted the crime, at common law, of obtaining property by false pretenses, but it has now lost its distinctive character by being included in that of larceny. People v. Laurence, 137 N. Y. 517-522, 33 N. E. 547; People v. Dumar, 106 N. Y. 502-508, 13 N. E. 325.

If Mrs. Cansdale's version is correct, as we now assume, the defendant was not giving expression to his opinion, or merely forecasting the probable outcome of the investigation, but he assumed to state facts peculiarly within his knowledge by reason of his familiarity with legal proceedings. He said the criminal proceedings had been started, that there was strong evidence against her, and that her only hope of escape rested on his employment. These were affirmations of facts, and operated to excite her apprehensions, and induced her to pay the money to him to obviate the disgrace which would result to herself and children from her arrest. In this trans-

action the parties were not on an equal footing. The defendant was a lawyer seeking a client, and pretending to give advice for her benefit, and which would shield her from a grave, but unfounded, accusation. It was but natural that, with her fears excited, she would give credit to his statements, and pay whatever he asked. To quote from the opinion of Mr. Justice Barrett concerning a like charge, reported in Therasson v. People, 20 Hun, at page 61: "Every word the attorney uttered carried with it the weight attached to superior knowledge, acting upon the responsibility of a sacred trust. Indeed, we are not prepared to say that, under such circumstances, what might otherwise be treated as a mere naked lie would not amount to a false pretense."

The evidence is ample to uphold the judgment of conviction, and the judgment of the county court, affirming that of the special sessions, should be affirmed. All concur.